IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| The Bend Hotel Development Company, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| | ) | |
| v. | ) | No. 20 C 4636 |
| | ) | |
| The Cincinnati Insurance Company | ) | |
| | ) | |
| | ) | |
| Defendant. | ) | |

Memorandum Opinion and Order

The complaint in this case recites what has unfortunately
become a familiar fact pattern. Plaintiff, a hotel located in East
Moline, Illinois, saw its business plummet in the wake of Governor
Pritzker's March 2020 public health orders requiring the closure
of all non-essential businesses in an effort to control the spread
of Covid-19 (the "Closure Orders"). Plaintiff sought coverage for
losses from defendant Cincinnati, from whom it had purchased an
"all risk" insurance policy. Defendant denied coverage, and this
lawsuit followed.

Plaintiff claims that defendant's denial of coverage amounts
to a breach of the parties' insurance contract, and it seeks
damages and a declaratory judgment that defendant has a duty to
cover the losses it claims. Plaintiff also asserts a claim for bad

faith denial of insurance coverage under ILCS 5/155 and seeks additional damages available under that statute, as well as an award of attorneys' fees and costs. Defendant moves to dismiss the complaint pursuant to Fed. R. Civ. P. 12(b)(6). The motion is granted.

All appear to agree that Illinois law governs the parties' dispute. In Illinois, the construction of an insurance policy is a question of law. *Country Mut. Ins. Co. v. Livorsi Marine, Inc*., 856 N.E.2d 338, 342 (2006). "If the words used in the policy are clear and unambiguous, they must be given their plain, ordinary, and popular meaning." *Cent. Ill. Light Co. v. Home Ins. Co.*, 821 N.E.2d 206, 213 (2004). While ambiguous terms—that is, terms that are susceptible to more than one reasonable interpretation—must be construed in favor of coverage, *Outboard Marine Corp. v. Liberty Mut. Ins. Co.*, 607 N.E.2d 1204, 1212 (1992), "[a] policy provision is not rendered ambiguous simply because the parties disagree as to its meaning," *Founders Ins. Co. v. Munoz*, 930 N.E.2d 999, 1004 (2010).

The policy provisions at issue are the following:

**SECTION A. COVERAGE**.

We will pay for direct "loss" to Covered Property at the "premises" caused by or resulting from any Covered Cause of Loss.

* * *

**(1) Business Income**

2

We will pay for the actual loss of "Business Income" and "Rental Value" you sustain due to the necessary "suspension" of your "operations" during the "period of restoration". The "suspension" must be caused by direct "loss" to property at a "premises" caused by or resulting from any Covered Cause of Loss. With respect to "loss" to personal property in the open or personal property in a vehicle or portable storage unit, the "premises" include the area within 1,000 feet of the building or 1,000 feet of the "premises", whichever is greater.

\* \* \*

**(2) Extra Expense**

**(a)** We will pay Extra Expense you sustain during the "period of restoration". Extra Expense means necessary expenses you sustain (as described in Paragraphs **(2)(b), (c)** and **(d)**) during the "period of restoration" that you would not have sustained if there had been no direct "loss" to property caused by or resulting from a Covered Cause of Loss.

**(b)** If these expenses reduce the otherwise payable "Business Income" "loss", we will pay expenses (other than the expense to repair or replace property as described in Paragraph **(2)(c)**) to:

  **1)** Avoid or minimize the "suspension" of business and to continue "operations" either:

   **a)** At the "premises"; or

   **b)** At replacement "premises" or temporary locations, including relocation expenses and costs to equip and operate the replacement location or temporary location; or

  **2)** Minimize the "suspension" of business if you cannot continue "operations".

**(c)** We will also pay expenses to:

  **1)** Repair or replace property; or

3

**2)** Research, replace or restore the lost information on damaged "valuable papers and records";

but only to the extent this payment reduces the otherwise payable "Business Income" "loss". If any property obtained for temporary use during the "period of restoration" remains after the resumption of normal "operations", the amount we will pay under this Coverage will be reduced by the salvage value of that property.

**(d)** Extra Expense does not apply to "loss" to Covered Property as described in the **BUILDING AND PERSONAL PROPERTY COVERAGE FORM.**

**(3) Civil Authority**

When a Covered Cause of Loss causes damage to property other than **Covered** Property at a "premises", we will pay for the actual loss of "Business Income" and necessary Extra Expense you sustain caused by action of civil authority that prohibits access to the "premises", provided that both of the following apply:

**(a)** Access to the area immediately surrounding the damaged property is prohibited by civil authority as a result of the damage; and

**(b)** The action of civil authority is taken in response to dangerous physical conditions resulting from the damage or continuation of the Covered Cause of Loss that caused the damage, or the action is taken to enable a civil authority to have unimpeded access to the damaged property.

This Civil Authority coverage for "Business Income" will begin immediately after the time of that action and will apply for a period of up to 30 days from the date of that action.

This Civil Authority coverage for Extra Expense will begin immediately after the time of that action and will end:

**1)** 30 consecutive days after the time of that
action; or
**2)** When your "Business Income" coverage ends;

whichever is later.

**SECTION G. DEFINITIONS**

* * *

8. "Loss" means accidental physical loss or accidental

physical damage.

(Policy at 3, 18–19, 38.)

Plaintiff concedes that by its terms, the policy "ostensibly
covers only damages related to the physical building." Resp. at 4.
But plaintiff argues that by expressly excluding "intangibles"
such as "damage to computer networks, and damage caused by smog,
pollutants, radiation, criminal acts like fraud, animal waste, and
fungi," the policy implicitly included coverage for other
"condition[s] that render the property unusable," including "a
physical intrusion into the property" of a virus such as the novel
coronavirus that causes Covid-19. *Id*. at 4–5. This argument has
several flaws.

First, plaintiff does not allege losses caused by an
"intrusion" of coronavirus into the physical property; it alleges
loss of business resulting from the Closure Orders. In this
respect, plaintiff's allegations differ from those in *Studio 417,*

*Inc. v. Cincinnati Ins. Co.*, No. 20-CV-03127-SRB, 2020 WL 4692385, at *4 (W.D. Mo. Aug. 12, 2020), where the complaint alleged that "COVID-19 allegedly attached to" the plaintiff's property, making it "unsafe and unusable." The court held that these allegations were sufficient to allege a "direct physical loss" which, the court explained, "is not synonymous with physical damage" under Missouri law. *Id*. 2020 WL 4692385, at *5.

Second, even if plaintiff had alleged the presence of the coronavirus on the premises, every court in this district that has interpreted similar provisions under Illinois law has concluded that the virus does not cause "direct physical loss or damage" to property. *See Bradley Hotel Corp. v. Aspen Specialty Ins. Co.*, No. 20 C 4249, 2020 WL 7889047, at *3 (N.D. Ill. Dec. 22, 2020); *T & E Chicago LLC v. Cincinnati Ins. Co.*, No. 20 C 4001, 2020 WL 6801845, at *4 (N.D. Ill. Nov. 19, 2020) (collecting cases); *Sandy Point Dental, PC v. Cincinnati Ins. Co.*, No. 20 CV 2160, 2020 WL 5630465, at *2 (N.D. Ill. Sept. 21, 2020), reconsideration denied, No. 20 CV 2160, 2021 WL 83758 (N.D. Ill. Jan. 10, 2021).

In *Sandy Point*—a case on all fours with this one as it raised the same claims based on the same policy provisions in a contract issued by the same insurer and was litigated by the same attorneys—the court explained:

> The critical policy language here—"direct physical loss"—unambiguously requires some form of actual, physical damage to the insured premises to trigger

6

> coverage. The words "direct" and "physical," which
> modify the word "loss," ordinarily connote actual,
> demonstrable harm of some form to the premises itself,
> rather than forced closure of the premises for reasons
> extraneous to the premises themselves, or adverse
> business consequences that flow from such closure.

*Id.*, 2020 WL 5630465, at *2. As in that case, plaintiff has not alleged any physical alteration or structural degradation to the premises, nor the need to "repair," "replace," or "restore" any physical element of the property in order to reopen for business. Yet, business interruptions necessitated by such activities "during the 'period of restoration'" are the types of losses covered by the Business Income and Extra Expense provisions, both of which are incorporated into the Civil Authority provisions and must, in any event, be caused by "direct loss" or "damage" to property.

For these reasons, it does not change the analysis that defendant could have, but did not, explicitly disclaim losses caused by viral or bacterial contamination, as plaintiff observes. *See* Resp. at 13-14. Plaintiff does not allege losses caused by viral contamination; and even if it did, the absence of such an exclusion does not inject ambiguity into the plain language of policy's express terms, which require direct physical loss or damage to the covered property.

The coronavirus has undeniably wreaked havoc not only on the physical health of millions of Americans, but also on the economic

health of the country and of businesses such as plaintiff. While I am sympathetic to plaintiff's difficult situation, I am constrained by the unambiguous terms of the policy to conclude that the losses it claims as a result of the Closure Orders are not covered. Accordingly, the motion to dismiss is granted.

**ENTER ORDER:**

**Elaine E. Bucklo**
United States District Judge

Dated: January 27, 2021